_____ FILED    _____ ENTERED
_____ LOGGED    _____ RECEIVED

OCT 3 0 2025
JAN 9 2026
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____    DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF:

**INFORMATION ASSOCIATED WITH
EOSPRIVATE101@GMAIL.COM,
SAADEJORIN@GMAIL.COM, AND
SAADEJORIN03@GMAIL.COM STORED AT
THE FBI BALTIMORE FIELD OFFICE
LOCATED AT 2600 LORD BALTIMORE
DRIVE, BALTIMORE, MD 21244**

Case No. 8:25-mj-02536

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Steven Fantigrossi, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, state the following:

#### Introduction and Agent Background

1.      I am a Special Agent with the FBI and have been since August 2020.[1] I am currently assigned to the FBI Baltimore Field Office in Baltimore, Maryland. During my employment as an FBI Agent, I have been assigned to investigate violations of federal law, including those concerning fraud and related activity in connection with computers. I have participated in the execution of federal search warrants on physical properties, vehicles, and digital media and have seized and transported digital evidence, in accordance with FBI procedures.

2.      I have received training and have gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, and the execution of searches and seizures. I have also received training on computer evidence identification, computer forensics, electronic device evidence seizure and processing, and various other criminal laws and procedures.

---

[1] All dates and times provided in this affidavit are approximate.

3.      This is an affidavit provided in support of an application for a search warrant

pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), and Federal Rule of Criminal

Procedure 41. Specifically, I seek a search warrant to search records previously provided by

Google LLC ("Google") and stored at the FBI Baltimore Field Office located at 2600 Lord

Baltimore Drive, Baltimore, MD 21244, pertaining to certain accounts (collectively, the

"**TARGET ACCOUNTS**"), further described herein and in Attachment A, and to authorize the

government to search for and seize the information listed in Attachment B.

4.      This affidavit is being submitted in support of a search warrant for records and

information related to the following **TARGET ACCOUNTS**:

    a.  Google    Accounts:    Information    and    records    associated    with

        **eosprivate101@gmail.com** ("**TARGET ACCOUNT 1**"), **saadejorin@gmail.com**

        ("**TARGET    ACCOUNT    2**"),    and    **saadejorin03@gmail.com**    ("**TARGET**

        **ACCOUNT 3**"), stored at the FBI Baltimore Field Office located at 2600 Lord

        Baltimore Drive, Baltimore, MD 21244.

5.      On December 6, 2022, the Honorable Ajmel A. Quereshi, United States Magistrate

Judge, District of Maryland signed search warrant 22-mj-3562-AAQ for the **TARGET**

**ACCOUNTS**.

6.      On January 23, 2023, Google provided records responsive to search warrant 22-mj-

3562-AAQ to the FBI.    That information has been kept in the FBI Baltimore Field Office in the

same condition in which it was originally provided by Google.

7.      Since this Affidavit is being submitted for the limited purpose of securing the

requested warrant, I have not included each and every fact known to me concerning this

investigation. Rather, I have set forth only those facts relevant to establish probable cause. The

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____ FILED       _____ ENTERED
_____ LOGGED      _____ RECEIVED

OCT 3 0 2025
JAN 9 2026
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____     DEPUTY

IN THE MATTER OF THE SEARCH OF:

INFORMATION ASSOCIATED WITH
EOSPRIVATE101@GMAIL.COM,
SAADEJORIN@GMAIL.COM, AND
SAADEJORIN03@GMAIL.COM STORED AT
THE FBI BALTIMORE FIELD OFFICE
LOCATED AT 2600 LORD BALTIMORE
DRIVE, BALTIMORE, MD 21244

Case No. 8:25-mj-02536 _____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Steven Fantigrossi, a Special Agent with the Federal Bureau of Investigation ("FBI"),
being duly sworn, state the following:

**Introduction and Agent Background**

1.      I am a Special Agent with the FBI and have been since August 2020.[1] I am
currently assigned to the FBI Baltimore Field Office in Baltimore, Maryland. During my
employment as an FBI Agent, I have been assigned to investigate violations of federal law,
including those concerning fraud and related activity in connection with computers. I have
participated in the execution of federal search warrants on physical properties, vehicles, and digital
media and have seized and transported digital evidence, in accordance with FBI procedures.

2.      I have received training and have gained experience in interviewing and
interrogation techniques, arrest procedures, search warrant applications, and the execution of
searches and seizures. I have also received training on computer evidence identification, computer
forensics, electronic device evidence seizure and processing, and various other criminal laws and
procedures.

---

[1] All dates and times provided in this affidavit are approximate.

3.    This is an affidavit provided in support of an application for a search warrant

pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), and Federal Rule of Criminal

Procedure 41. Specifically, I seek a search warrant to search records previously provided by

Google LLC ("Google") and stored at the FBI Baltimore Field Office located at 2600 Lord

Baltimore Drive, Baltimore, MD 21244, pertaining to certain accounts (collectively, the

"**TARGET ACCOUNTS**"), further described herein and in Attachment A, and to authorize the

government to search for and seize the information listed in Attachment B.

4.    This affidavit is being submitted in support of a search warrant for records and

information related to the following **TARGET ACCOUNTS**:

a.    Google    Accounts:    Information    and    records    associated    with
**eosprivate101@gmail.com ("TARGET ACCOUNT 1"), saadejorin@gmail.com**
("**TARGET    ACCOUNT    2**"),    and    **saadejorin03@gmail.com**    ("**TARGET**
**ACCOUNT 3**"), stored at the FBI Baltimore Field Office located at 2600 Lord
Baltimore Drive, Baltimore, MD 21244.

5.    On December 6, 2022, the Honorable Ajmel A. Quereshi, United States Magistrate

Judge, District of Maryland signed search warrant 22-mj-3562-AAQ for the **TARGET**

**ACCOUNTS**.

6.    On January 23, 2023, Google provided records responsive to search warrant 22-mj-

3562-AAQ to the FBI.   That information has been kept in the FBI Baltimore Field Office in the

same condition in which it was originally provided by Google.

7.    Since this Affidavit is being submitted for the limited purpose of securing the

requested warrant, I have not included each and every fact known to me concerning this

investigation. Rather, I have set forth only those facts relevant to establish probable cause. The

2

information in this Affidavit is based on conversations with other law enforcement officers and others, my review of various documents and records, and, where specified, my personal observations and knowledge.

8.    Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the **TARGET ACCOUNTS** have been used to commit the offenses of Wire Fraud, in violation of 18 U.S.C. § 1343; Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; Computer Fraud, in violation of 18 U.S.C. § 1030; and Conspiracy to Commit Any Offense Against the United States, in violation of 18 U.S.C. § 371 (collectively, the "Target Offenses"). Your affiant further submits that there is probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes further described in Attachment B.

### Jurisdiction

9.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that[ ] has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Maryland. *See* 18 U.S.C. § 3237.

### Probable Cause

### I.    *Overview*

10.    The investigation has focused on a business email compromise ("BEC") scheme perpetrated by individuals through the use of multiple deceptive techniques. The scheme resulted

information in this Affidavit is based on conversations with other law enforcement officers and others, my review of various documents and records, and, where specified, my personal observations and knowledge.

8.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the **TARGET ACCOUNTS** have been used to commit the offenses of Wire Fraud, in violation of 18 U.S.C. § 1343; Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; Computer Fraud, in violation of 18 U.S.C. § 1030; and Conspiracy to Commit Any Offense Against the United States, in violation of 18 U.S.C. § 371 (collectively, the "Target Offenses"). Your affiant further submits that there is probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes further described in Attachment B.

### Jurisdiction

9.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that[ ] has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Maryland. *See* 18 U.S.C. § 3237.

### Probable Cause

### I.    *Overview*

10.      The investigation has focused on a business email compromise ("BEC") scheme perpetrated by individuals through the use of multiple deceptive techniques. The scheme resulted

3

in Victim 1 being induced to wire approximately $7.5 million to various bank accounts located in Hong Kong.

11.     Victim 1 is a charity organization located in North Bethesda, Maryland. Victim 1 provided investment services to other charity organizations, including Victim 2, a charity located in New York, New York. Victim 1 and Victim 2 have a long-standing relationship where Victim 2 sends a portion of its charity funds to Victim 1 in order for Victim 1 to invest said funds on behalf of Victim 2. Victim 2 can request a return of invested funds from Victim 1, which it does on a regular, typically annual, basis. To request such a return, Victim 2's Controller emails a form requesting the withdrawal to Employee 1 and/or Employee 2 at Victim 1. The form contains the amount to be withdrawn, which of Victim 2's accounts the money should be withdrawn from, and Victim 2's account into which the withdrawn funds should be deposited. Law enforcement interviewed the Controller who stated that requested funds were always deposited into the same accounts for Victim 2 and that Victim 2 had never requested money to be sent to an account in Hong Kong.

12.     Victim 1 established a multi-factor authentication for employees to access their corporate email account. A multi-factor authentication requires employees to use their username and password to sign into the email account, which then prompts a text to be sent to the employee's phone. This text requires the employee to either confirm that the login attempt was the employee trying to access their company email account or deny access because that employee did not initiate the login attempt. Once the login attempt is confirmed via the employee's phone, the employee would be given access to their corporate email account. The multi-factor authentication on the phone was prompted approximately every three months as well as when an employee attempted to login from a new device.

4

13.   Employee 1 received over 40 multi-factor authentication alerts starting in or about early June 2020. Employee 1 did not initiate these multifactor authentication alerts by accessing their email account at Victim 1, but nonetheless confirmed each of these authentication alerts. By confirming the authentication alerts, Employee 1 gave the co-conspirators access to Employee 1's email account at Victim 1. Based on knowledge, training, and experience with this matter, I believe this access allowed the co-conspirators to view prior wire transfer requests from Victim 2 to Victim 1 and to observe the method by which Victim 2 made withdrawal requests from Victim 1. The co-conspirators were thereafter able to craft their own fraudulent requests by imitating Employee 1 at Victim 1 and the Controller at Victim 2.

14.   Adejorin also registered spoofed domains to perpetuate the scheme. These spoofed domains were a misspelling of the domains used by Victim 1 and Victim 2. Domain spoofing is where an attacker impersonates a known business or person with a fake website or email domain to fool individuals into trusting them. Typically, the domain appears to be legitimate at first glance, but a closer look reveals that it contains an additional letter or number that is not readily noticeable to the eye.

15.   Adejorin used the spoofed domain of Victim 2 to create spoofed email addresses. Adejorin added a spoofed email address of Victim 2 on the "cc" line during communications with Victim 1. Adejorin added the spoofed email address of Victim 2 to the "cc" line in order to make it appear to employees of Victim 1 that they were communicating with multiple Victim 2 employees, when in actuality they were communicating with Adejorin. By using the spoofed email addresses, Adejorin prevented employees of Victim 2 from identifying the fraudulent wire requests.

16.    After the BEC was discovered, Victim 1's IT contractor conducted a review of Employee 1's email account. The IT contractor uncovered emails that appeared to originate from Employee 1 and directed other Victim 1 employees to send funds at what appeared to be the request of Victim 2. Through four wire transfers, approximately $7.5 million of Victim 2's funds under the control of Victim 1 were sent to beneficiary bank accounts in Hong Kong controlled by the co-conspirators.

17.    In August 2020, a fifth attempt was made by Adejorin to cause Victim 1 to wire a further approximately $1.3 million of Victim 2's money to a beneficiary bank account in Hong Kong. Having discovered the BEC at this time, Victim 1 was able to stop the fifth attempt from being successful.

## II.    *Timeline of the BEC Scheme*

18.    On June 5, 2020, Employee 2 received an email from what appeared to be Victim 2's Controller. Employee 1 was copied on the email. Victim 2 appeared to be requesting a $924,000.00 wire transfer from Victim 2's funds invested with Victim 1.    Victim 2 was purportedly requesting the funds be sent to a bank account in Hong Kong. On June 10, 2020, Victim 1 effectuated the wire transfer of $924,000.00 to Beneficiary Bank Account 1 in Hong Kong.

19.    On June 16, 2020, Employee 2 received an email from what appeared to be Victim 2's Controller. Employee 1 was again copied on the email. Victim 2 appeared to be requesting a $1.995 million wire transfer from Victim 2's funds invested with Victim 1 to be sent to a bank account in Hong Kong. On June 19, 2020, Victim 1 wired $1.995 million to Beneficiary Bank Account 2 in Hong Kong.

20.    On July 7, 2020, Employee 2 received an email from what appeared to be Victim 2's Controller, copying Employee 1. Victim 2 appeared to be requesting a $3.12 million wire

transfer from Victim 2's funds invested with Victim 1. Victim 2 was purportedly requesting the funds be sent to a bank account in Hong Kong. On July 10, 2020, Victim 1 wired $3.125 million to Beneficiary Bank Account 3 in Hong Kong.

21.    On July 16, 2020, Employee 2 received an email from what appeared to be Victim 2's Controller, copying Employee 1. Victim 2 appeared to be requesting a $1.471 million wire transfer from Victim 2's funds invested with Victim 1 to be sent to a bank account in Hong Kong. On July 20, 2020, Victim 1 wired $1.471 million to Beneficiary Bank Account 4 in Hong Kong.

22.    On August 5, 2020, Victim 1 discovered that the four wire transfers described above were not actually initiated by Victim 2 and the funds were transferred based upon fraudulent requests. The FBI interviewed Victim 2's representatives who confirmed that Victim 2 did not request any of the above wire transfers and that the funds were not sent to a beneficiary bank related to Victim 2 or an account controlled by Victim 2.

23.    Victim 1 quickly took numerous steps to prevent further fraudulent wires, including hiring an outside cyber security specialist (CSS).

24.    On August 13, 2020, Employee 2 received another wire transfer request purporting to be from Victim 2's Controller. The request was for approximately $1,349,104.83 in Victim 2's funds under the control of Victim 1 and to be sent to Beneficiary Bank Account 5 in Hong Kong.

25.    Victim 1's CSS set up a server which appeared to be an online portal setup by Victim 1. The online portal was setup to appear as a website where charity organizations (such as Victim 2) could fill out a form to request wire transfers from Victim 1. Victim 1's CSS set up the server so that when it was accessed information about the user accessing the website could be passively collected. Such information included the Internet Protocol ("IP") address of the device connecting to the server.

7

26.    Victim 1's CSS also set up an email address with Victim 1's domain name, in order to engage in further email communication with the co-conspirators. On August 14, 2020, Victim 1's CSS sent an email to the co-conspirators in response to the August 13, 2020, wire transfer request. The email included a link to the webpage and server set up by Victim 1's CSS.

27.    Information provided by Victim 1's CSS showed that on August 14, 2020, within minutes of the CSS sending the email containing the link to the webpage, the IP address 107.173.219.8 (the "2198 IP address") accessed the server set up by Victim 1's CSS. The 2198 IP address was also used to submit a form on the online portal requesting the transfer of $1,349,104.83 in Victim 2's funds to be sent to Beneficiary Bank Account 5 in Hong Kong.

28.    After the portal submission, the co-conspirators continued to correspond via email with Victim 1's CSS. Information provided by Victim 1's CSS showed that on August 17, 2020, a spoofed email address from what appeared to be an employee of Victim 2 was sent from IP address 23.254.244.221 (the "4221 IP address").

### III.    *Identifying the 2198 and 4221 IP Addresses*

29.    Open-source research revealed that the 2198 IP address resolved to a web hosting provider, ColoCrossing, Inc., which was leased and operated by Net3. Net3 provides a hosting services platform to a wide range of businesses and individuals, including cloud-based file storage, websites, and web-application hosting.

30.    Net3 provided the FBI with billing information identifying an individual using the name "Dicksons Zedd" as the client who leased the 2198 IP address. According to the billing information, the registration date of the order for the 2198 IP address was April 20, 2020, and the next payment due date was October 20, 2020.

31.    Several factors about the billing information appear fraudulent. The billing information showed Zedd provided a contact phone number ending in 0123 and based in the United States as well as a second contact number ending in 8123 based in the United Kingdom. The billing information also showed Zedd provided a contact address in North Lincolnshire, United Kingdom. Open-source research showed that this was not an actual location in the UK. Through my training and experience, I know that cyber criminals often use fake, randomly generated addresses to obfuscate their activities.

32.    On October 9, 2020, Net3 voluntarily transferred information associated with the 2198 IP address to a secure server at the FBI Field Office in Baltimore, Maryland. On October 22, 2020, the FBI obtained a warrant to search the information associated with the 2198 IP address.

33.    The Net3 information revealed that the owner of the 2198 IP address visited the webpage of Victim 1 and conducted search queries and viewed news articles about this BEC scheme.

34.    In addition, the search showed that the owner of the 2198 IP address accessed computing sessions at HostWinds, LLC ("HostWinds"). HostWinds is a U.S.-based provider of shared, cloud, virtual, and dedicated servers. Virtual Private Servers ("VPSs") are servers that allow end users to access the resource via the internet. Based on my training and experience, I know that cyber criminals often use multiple VPSs to obfuscate their criminal activity and avoid detection by law enforcement.

35.    HostWinds provided the FBI with the following subscriber information for these sessions:

> Name: Mary Strait
> Email address: marystrait404@mail.com
> Address: [REDACTED], Portland, Oregon 97236
> Date created: 2020-07-22

9

36.     Separately, the FBI determined that HostWinds was also the Internet Service provider for the 4221 IP address. Based on information provided by HostWinds, the 4221 IP address was registered to the same subscriber.

37.     1&1 Mail & Media provided the FBI the following registration information for marystrait404@mail.com:

> Name: TIMOTHY RILEY
> Registration Date: 2020-06-20 21:46
> DOB: 1980-[REDACTED]
> Email Address: timothyriley004@mail.com
> Alternative Email Address: **TARGET ACCOUNT 1**

38.     According to 1&1 Mail & Media's website, mail.com subscribers can use one central mailbox/account to send and receive messages from several email addresses, referred to as "alias" email addresses. An alias email address is an additional address associated with the subscriber's account, which subscribers can use so that the recipient only sees only that alias address, instead of the email address the subscriber initially registered for. With mail.com, a subscriber can create and use up to nine alias email addresses for each email address initially registered for.

39.     According to information provided to the FBI by 1&1 Mail & Media, timothyriley004@mail.com appears to be the initial/primary email address, with marystrait404@mail.com set up as one of its nine additional aliases. timothyriley004@mail.com and marystrait404@mail.com are associated with the same customer number. A review of the records provided by 1&1 Mail & Media pursuant to search warrant 22-mj-3561-AAQ signed by the Honorable Ajmel A. Quereshi, United States Magistrate Judge for the District Court of Maryland for email accounts timothyriley004@mail.com and marystrait404@mail.com revealed both are all the same account and have the same central mailbox.

10

40.     As shown above, **TARGET ACCOUNT 1** was used as the alternative email address for timothyriley004@mail.com. An alternative email address, also referred to as a recovery email address, is an additional email address that many email providers or Internet services sometimes require from users during registration. The recovery process can also be done with a recovery phone number, which a user may be required to provide during registration. A recovery email or phone helps a user reset the account password in case the user forgets the password or is otherwise locked out. The recovery email and phone are sometimes used to authenticate registered users prior to them having access to the internet service. Based on my training, knowledge and experience, I know that individuals who conduct computer intrusions often create multiple email addresses with different email providers (*e.g.*, 1&1 Mail & Media, Google) to make it harder to track their true identity. I also know that individuals who conduct computer intrusions store incriminatory information on recovery/backup email accounts that are linked to their primary accounts. Accordingly, I know that recovery email accounts can provide evidence regarding the identity and location of the user of the email account as well as evidence, instrumentalities, and fruits of the crimes under investigation.

41.     On January 8, 2025, the FBI conducted a proffer interview with Adejorin and his counsel. During the proffer, Adejorin told the FBI that he used email address marystrait404@mail.com to set up a private server for an associate, Benjamin Adewumi, who would ask Adejorin to do things for him due to Adejorin's experience with technology. Adewumi asked Adejorin to set up a private server to host a private domain that Adewumi had purchased. Since the two were close friends, Adejorin did not ask Adewumi, nor did Adewumi tell Adejorin, the reason for establishing the server.   Adejorin said he set up the private server and gave

11

Adewumi the login information. Adejorin told the FBI that he came up with the name "Mary

Strait" by searching for names on Google.

42.    Google provided subscriber records for **TARGET ACCOUNT 1**, including the

following:

>    **TARGET ACCOUNT 1**
>    Google Account ID: 414074482303
>    Name: eos private
>    Email: **TARGET ACCOUNT 1**
>    Created on: 2018-06-10 00:49:53 Z
>    Terms of Service IP: 77.234.46.223
>    Services: Gmail, Web & App Activity, Location History, Google Hangouts,
>    Google Calendar, Google My Maps, YouTube, Android, Google Analytics
>    Recovery Email: countryman004@gmail.com
>    Recovery SMS: [None listed in Google record(s) provided]

## IV.    *Additional Investigation*

43.    The FBI conducted open-source research for the spoofed domains used to create

the spoofed email addresses used by the co-conspirators to impersonate Victim 1 and Victim 2.

The FBI determined that NameCheap.com ("NameCheap") was the registrar for these spoofed

domains.

44.    On August 28, 2020, NameCheap provided subscriber information for the account

which purchased the spoofed domains used in this BEC scheme, which included the following:

>    Username: worktony22
>    Name: Tony Bruce
>    Email: worktony22@yandex.com
>    Signup Date: 9/12/2018
>    Signup IP: 154.118.69.160
>    Organization: TONYLLC
>    Organization: 45 State Street New York, NY 10005
>    Phone: [REDACTED]7899

45.    The purchase history for the worktony22 NameCheap account revealed that

payments for these domains were made through virtual currency transactions conducted via BitPay

Inc. ("BitPay"). The BitPay transactions also listed corresponding invoice IDs for each transaction. BitPay is a U.S.-based company that allows customers to make payments to businesses in Bitcoin and other virtual currencies. BitPay then changes the Bitcoin payment into one of eight major currencies, such as the U.S. Dollar, and pays it directly to the business.

46.     BitPay provided information to the FBI that, on May 18, 2020, approximately 0.001264 Bitcoin (valued at approximately $12.11 at the time), was paid to the worktony22 account. BitPay records listed **TARGET ACCOUNT 1** as the payment email. Records from NameCheap show that on June 5, 2020, approximately 18 days after the above payment was made, the spoofed domains used to impersonate Victim 1 and Victim 2 were registered by the worktony22 NameCheap account.

47.     Since **TARGET ACCOUNT 1** was used as a payment email for the NameCheap account that purchased the spoofed domains used in this BEC, there is probable cause to believe that **TARGET ACCOUNT 1** contains evidence, instrumentalities, and fruits of the crimes under investigation, which may include but are not limited to the registration of and payments for the spoofed domains used to commit the BEC under investigation, as well as information about co-conspirators and other evidence such as passwords of compromised email accounts and evidence of research of Victim 1 and Victim 2.

48.     Records provided by Google listed several email addresses connected by cookies to **TARGET ACCOUNT 1**, including **TARGET ACCOUNT 2**. In the "Privacy & Terms" portion of its website, Google states: "Cookies are small pieces of text sent to your browser by a website you visit." Google further states that it uses cookies "for advertising, including serving and rendering ads, personalizing ads [. . .], limiting the number of times an ad is shown to a user, muting ads you have chosen to stop seeing, and measuring the effectiveness of ads." Based on my

training and experience, cookies are specific to a particular internet browser used on a particular device. To illustrate, when a particular user visits a website using an internet browser on a device, the website will send a piece of text to the internet browser with a unique identifier. If the user visits the same website again, the website will recognize the device by the cookie stored in the internet browser with the previously generated unique identifier. As a result, there is probable cause that **TARGET ACCOUNT 1** and **TARGET ACCOUNT 2** were created and/or controlled by the same individual.

49.    During the January 8, 2025 proffer session with the FBI, Adejorin told the FBI he registered **TARGET ACCOUNT 1** and that Adewumi had access to the email account.

50.    Additional records obtained from Google showed that **TARGET ACCOUNT 2** was used as the recovery email address for **TARGET ACCOUNT 3**. Google provided subscriber records for these accounts, including the following information:

> **TARGET ACCOUNT 2**
> Google Account ID: 265653053630
> Name: Olusegun Samson
> Email: **TARGET ACCOUNT 2**
> Created on: 2016-09-28 17:25:45 Z
> Terms of Service IP: 169.159.121.70
> Services: Web & App Activity, Gmail, Google Hangouts, Google Chrome Sync, Google Calendar, YouTube, Location History, Android, Google Analytics, Google Play, Google Play Music, Chromeos Login, Google Voice, Google Payments, Google Ads, Project Fi, Google Docs, Dynamite
> Recovery email: saadejorin@aol.com
> Recovery SMS: +2348149484298
>
> **TARGET ACCOUNT 3**
> Google Account ID: 644228515977
> Name: Olusegun Adejorin
> Email: **TARGET ACCOUNT 3**
> Created on: 2022-05-17 17:59:49 Z
> Terms of Service IP: 2001:7d0:82f7:fe80:6c66:8e43:ef52:5b1a
> Services: Gmail, Web & App Activity, Google Calendar, YouTube
> Recovery email: **TARGET ACCOUNT 2**
> Recovery SMS: +37254790758

14

51.    Based on my training, knowledge, and experience, I know that cyber criminals establish many different email addresses, often for discrete purposes. For example, a cyber criminal may establish an email address to register spoofed domains for later use in BECs, and a separate email address to use in establishing virtual currency accounts or financial accounts, for the purpose of laundering the proceeds of the BEC. The separate email addresses may be established at different points in time, sometimes years later. Cyber criminals may use this method to separate instrumentalities of the crime and make it more difficult for law enforcement to determine their identity and/or obtain evidence of the crime. In this case, based on my training, knowledge, and experience, I believe **TARGET ACCOUNT 3** was established for the purpose of separating certain accounts and/or criminal activity which may be connected to **TARGET ACCOUNT 2**. In addition, with the use of **TARGET ACCOUNT 2** as the recovery email address for **TARGET ACCOUNT 3**, I believe there is probable cause that **TARGET ACCOUNT 2** and **TARGET ACCOUNT 3** are controlled by the same person and that these accounts contain evidence, instrumentalities, and fruits of the crimes under investigation.

52.    Based on the above, including the identified connections between timothyriley004@mail.com and marystrait404@mail.com and the HostWinds IP addresses, **TARGET ACCOUNT 1** and the @mail.com emails, and **TARGET ACCOUNT 1** and the Namecheap worktony22 account and BitPay transaction records, there is probable cause that **TARGET ACCOUNT 1** contains evidence, instrumentalities, and fruits of the Target Offenses.

53.    As described and based on the above, there is probable cause to believe **TARGET ACCOUNT 2** is connected to **TARGET ACCOUNT 1** by cookies, that **TARGET ACCOUNT 2** is the recovery email address for **TARGET ACCOUNT 3**, that all the **TARGET ACCOUNTS**

15

are controlled by the Adejorin, and that the **TARGET ACCOUNTS** contain evidence, instrumentalities, and fruits of the Target Offenses.

### Background Concerning Google[2]

54.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name gmail.com, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence or instrumentalities of the crimes under investigation because the information can be used to identify the account's user or users.

55.    A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

---

[2] Google services may include: electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); Domain name management service such as Google Domains (Domain registration); and Google Play (which allow users to purchase and download digital content, *e.g.*, applications).

emails), and other files, on servers maintained and/or owned by Google. Google provides numerous free services to its users with a Google account. Some of services include YouTube, Voice, Blogger, Google+, Android, Photos, Drive, Maps and Location History, Waze, and Search and Browsing History. YouTube is a free video sharing website that allows users upload, view and share videos. Voice is Google's calling, voicemail transcription, and text messaging service. Blogger is Google's free weblog publishing tool for sharing text, photos, and video. Google+ is a forum to share photos, videos, and other information with other users. Android is Google's open-source operating system used for mobile devices. Photos stores images for a broad range of Google products. Drive is Google's online storage service for a wide range of file types. Maps offer addresses and/or directions and users can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Waze is a GPS application owned by Google that provides information about a user's location and navigation history. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

56.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence or instrumentalities of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my

17

experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

57.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.,* session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

58.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence or instrumentalities of the crimes under investigation because the information can be used to identify the account's user or users.

59.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or

18

alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner or user. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's or user's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's or user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

### Conclusion

60.    Based on the foregoing, I submit that there is probable cause to search the property described in Attachment A and to search for and seize the information listed in Attachment B. Because this warrant will be served on the federal law enforcement agency that already has custody

of the information sought; there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*Steven Fantigrossi*

Steven Fantigrossi
Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this __3rd__ day of October 2025.

Hon. Ajmel A. Quereshi
United States Magistrate Judge

20

## ATTACHMENT A – Google LLC

### Property to Be Searched

This warrant applies to records and information associated with the following accounts from Google LLC, which are stored at the FBI Baltimore Field Office at 2600 Lord Baltimore Drive, Baltimore MD 21244:

- **eosprivate101@gmail.com**
- **saadejorin@gmail.com**
- **saadejorin03@gmail.com**

## ATTACHMENT B – Google LLC

### Particular Things to be Seized

**I.    Files and Accounts produced by Google LLC, from January 1, 2020 to December 6, 2022**

The following information, including any messages, records, files, logs, images, videos, or information that had been deleted but were still available to Google or had been preserved pursuant to a preservation request under 18 U.S.C. § 2703(f), which had already been provided by Google LLC to the Federal Bureau of Investigation ("FBI") pursuant to a prior search warrant filed under 22-mj-3562-AAQ and is currently in FBI custody, is to be seized for each account or identifier listed in Attachment A for the time period from January 1, 2020 through December 6, 2022:

**A.  Google Account Information**
   i.    Google account registration information, including name, user-specified contact information, recovery email address, recovery SMS number, account creation timestamp and IP address, and a list of Google services the account holder has enabled or accessed;
   ii.   Account change history IP addresses and associated timestamps;
   iii.  Google account login and logout IP addresses and associated timestamps;
   iv.   All means and sources of payment for all Google products and services (including complete credit or bank account numbers), and detailed billing records;
   v.    All cookie and user-specific advertising data, including third-party cookies;

**B.  Gmail Account Information**
   i.    Gmail specific subscriber information, login and logout IP addresses and associated timestamps;
   ii.   Gmail specific non-content email header information, originating message IP addresses, and account settings;
   iii.  The contents of all emails, attachments and chat messages stored in the account, including copies of emails sent to and from the account, draft emails, the source and destination emails sent addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;
   iv.   Contents of all available deleted emails;

**C.  YouTube Account Information**
   i.    YouTube specific subscriber information, including date of birth and country;
   ii.   YouTube specific login and logout IP addresses and associated timestamps;
   iii.  YouTube video upload IP addresses and associated timestamps;
   iv.   Copies of all publicly available videos;
   v.    Copies of all private videos and associated video information;
   vi.   Copies of all private messages;
   vii.  All Channel or Video comments;
   viii. All contacts;

**D.** **Google Voice Account Information**
   i. Voice specific subscriber information, including signup IP and associated timestamp and user-provided name;
   ii. Most recent 28 days of call and text logs;
   iii. All account settings and account change history;
   iv. Contents of all voicemail messages and text messages;

**E.** **Blogger Account Information**
   i. Blogger specific subscriber information, including Blog registration information, Blog creation IP and timestamp, Blog owner/admin subscriber information, and post or comment owner information;
   ii. All contents of private blog posts and comments;

**F.** **Google+ Account Information**
   i. Google+ specific subscriber and IP address information, including associated timestamps;
   ii. All IP addresses and timestamps associated with Posts, Comments, or Photos;
   iii. All Content/Activity Stream, including posts, comments, and photos;
   iv. All contacts/Circles;
   v. Google+ Profiles;

**G.** **Android Account Information**
   i. Android specific subscriber and IP address information, including associated timestamps;
   ii. All device IDs, IMEIs, and MEIDs associated with the target account(s);
   iii. Timestamps, including device registration, first check-in, and last check-in;
   iv. All Google accounts tied to the Android device(s) if any;
   v. Android hardware information;
   vi. Cell carrier/service provider;
   vii. All apps downloaded to the device;

**H.** **Photos Account Information**
   i. Photos specific subscriber and IP address information, including associated timestamps;
   ii. All upload IP addresses and associated timestamps;
   iii. Contents of all Photos and Albums, including all exif data included by the user as part of the upload;

**I.** **Drive Account Information**
   i. Drive specific subscriber and IP address information, including associated timestamps;
   ii. All upload IP addresses and associated timestamps;
   iii. All Drive content, including Docs, Sheets and Slides;

**J.** **Google Location and Search History Information**
   i. All location history with associated timestamps for the following dates:

2

         a.   January 1, 2020 to December 6, 2022.

    ii.   All search history and associated timestamps, including all "clicks" and "queries;"

**K. Maps Information**

    i.   All maps data associated with the account, including Google Maps and Google Trips, including all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

**L. Waze Location and Search History Information**

    ii.   Waze specific subscriber information, login and logout IP addresses and associated timestamps;

    iii.   Waze specific non-content information, including account settings;

    iv.   All location history with associated timestamps for the following dates:

         a.   January 1, 2020 to December 6, 2022.

    v.   All Waze search history and associated timestamps, including all "clicks" and "queries;"

    vi.   All Waze locations saved by the user.

**II.   Information to be Seized by Law Enforcement Personnel**

Any and all records and information that relate in any way to the accounts described in Attachment A-1 that constitutes evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1030 (computer fraud); 1343 (wire fraud); 1349 (conspiracy to commit wire fraud) 1028A (aggravated identity theft); and 371 (conspiracy to commit any offense against the United States), including information on the following:

a.  All records or other information relating to the commission of the specified federal offenses;

b.  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner or user;

c.  All images, messages, communications, calendar entries, and contacts regarding or relating to a business email compromise scheme and/or the attempts to gain unauthorized access to computer systems, including any and all preparatory steps taken in furtherance of these crimes;

d.  Electronic accounts, computer infrastructure, hardware, and software used to gain unauthorized access to computers and perform other unlawful or malicious computer activity;

e.  Messages between co-conspirators preparing to commit the crimes or conversation during or after the crimes;

f. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

g. Evidence indicating the account owner's or user's state of mind as it relates to the crime under investigation including but not limited to information about the crimes under investigation and information about evading or avoiding detection or apprehension by law enforcement;

h. The collection of personally identifiable information of individuals, including but not limited to names, social security numbers, dates of birth, driver's license information, addresses, telephone numbers, and email addresses;

i. Records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

j. Credit card and other financial information, including but not limited to bills and payment records evidencing ownership of the subject accounts; money transfers, exchanges, money transmitter services, peer-to-peer transactions; and bank, cryptocurrency, or financial accounts;

k. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts;

l. All images, messages and communications regarding obfuscation software, encryption or other methods to attempt to avoid detection by law enforcement;

m. Passwords and encryption keys, and other access information that may be necessary to access the account(s) or identifier(s) and other associated accounts;

n. All records or other information relating to any attempted or effectuated wire transfers, including but not limited to any on or about June 10, 2020; June 19, 2020; July 10, 2020; July 20, 2020; and August 13, 2020;

o. All records or other information that relates to hardware, software, or facilities, including IP addresses and servers, used to conduct a business email compromise scheme;

p. All "address books" or other lists of contacts; and

q. Any records relating to other apps or accounts, including but not limited to virtual currency exchange accounts or encrypted messaging apps.

III.    Government Procedures for Warrant Execution

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably

4

practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any